While I concur with the majority that Appellant's first and third assignments of error have no merit, I must strongly dissent with their conclusion that Appellant's second assignment is meritorious. For the reasons which follow, I would overrule this assignment of error as well and would affirm the trial court decision in all respects.
As an initial matter, I agree with the majority's enunciation of our standard of review on appeal. As stated at p. 4 of the Opinion, we may reverse only upon a showing that the court below abused its discretion in some fashion. In an administrative appeal, such as this one, we are limited in our review, since we are to determine only whether the trial court had before it on the record some reliable, probative and substantial evidence and, further, if it is in accordance with the law.Lorain City Bd. of Edn. v. State Emp. Relations Bd. (1988),40 Ohio St.3d 257, 262. Further, we may not substitute our judgment for that of the trial court so long as some competent and credible evidence on the record supports the trial court's factual findings. Seasons CoalCo. v. Cleveland (1984), 10 Ohio St.3d 77, 80. In the matter before us, there was ample evidence to support the civil service commission and trial court decision and thus, we may not reverse that decision.
Appellant argues in assignment of error number two that the trial court erred in finding that he "willfully refused" the release of necessary information as to his mandatory counseling session. Appellant's basis for this assignment is that since no one in the City of Steubenville gave him a "specific directive" as to exactly what information was to be released, his decision to allow only a release of the fact that he attended the session was sufficient. Appellant essentially argues that, because he was not given an itemized breakdown as to what information was required to be released to the City, his decision to release only the fact of his attendance cannot be seen as a willful refusal to release information.
He is aided in this by the majority's unfounded conclusion at page 9 of the Opinion that the City somehow failed a specific duty owed to Appellant. The majority somehow gleans, in direct opposition to the facts as found by the Steubenville Civil Service Commission and the trial court, that Appellant's interpretation of the consent decree underlying this issue somehow allowed him to, ". . .confidently believ[e] that mandatory counseling required he disclose only the fact that he attended the session as ordered." Based on the testimony presented to the Civil Service Commission and the record before us, this finding by the majority is unsupported.
The majority recognizes that, ". . . merely providing confirmation that the session was attended does not satisfy the mandates of the Decree." (Opinion, p. 6.) The majority goes on to state that Appellant was not directly explained the import of the full decree by the City, which had a mandatory duty to do so, and that this resulted in Appellant's failure to be notified that he was required to disclose more than mere attendance. A review of the record, however, shows that there was more than enough reliable, competent evidence to support the fact that Appellant knew exactly what was required to be disclosed and thus to support the determinations below.
A review of Appellant's testimony before the civil service commission reveals that this testimony is evasive and contradictory at best. His most direct exchange can be found under questioning by the Law Director, Mr. Gary Repella:
 "Q. You are familiar with the contents of the [consent] decree?
"A. Yes, I am.
 "Q. You have read it and studied it many times; isn't that true?
"A. I have read through it many times, yes.
 "Q. You have previously stated that you understand all of the items contained in the consent decree; is that true?
"A. Yes.
 "Q. Is it still your feeling today that you understand all the items in the consent decree?
"A. I feel that I do, yes.
 "Q. Now, during your time as a Steubenville policeman you are aware of various orders directing you to contact the law director should you have any questions concerning the consent decree; is that not true?
"A. That's true.
 "Q. I'm handing you what has been marked as City Exhibit Number 8. Could you identify that, please?
 "A. It's General Order 40-97 dated September 5, 1997 to all turn commanders from the chief's office.
"Q. And could you read the last sentence of that order?
 "A. `If there is anything you don't understand or you have any questions, contact the Law Director Gary Repella.'
 "Q. Now, since the inception of the consent decree on September 3, 1997, have you ever contacted me to ask a question about the consent decree?
"A. No, I haven't.
 "Q. Now, I am handing you what has been marked as City Exhibit Number 2. Could you identify that, please?
 "A. General Order 49-98 dated May 7, 1998 to myself from Chief McCartney.
"Q. And if you could read those two paragraphs, please?
 "A. `Due to the fact that you have three complaints registered against you with the Internal Affairs Division, I am hereby ordering you to Work Care on University Boulevard for counselling. You are to report to Lou Scott of Work Care on Thursday, May 28, 1998 at 4:30 p.m. This is a mandatory appointment.'
"Q. Now, do you know why you received Order number 49-98?
 "A. I assume it's because I had three complaints against me in Internal Affairs.
"Q. Is that listed in the consent decree?
 "A. Yes, it is. It's one of many options, yes." (Tr. pp. 10-11).
* * *
 "Q. Now, do you agree that under item 66b supervisory personnel of the police department have a duty to address the types of misconduct that are alleged against you?
"A. Can you rephrase that again?
 "Q. Do you agree that under item 66b the supervisory personnel of the police department have a duty to address the types of misconduct that were alleged against you?
"A. Yes.
 "Q. Do you agree that when Chief McCartney ordered you to attend mandatory counseling your supervisors were taking a first step in addressing your problem?
"A. I would assume, yes.
 "Q. You agree that supervisory personnel have a duty to inquire into the allegations and formulate a plan to improve your job performance?
"A. Yes, and if there's a problem, yes.
 "Q. Now, item 66b, it lists some of the responses that a supervisor can take; isn't that true?
"A. That's true.
 "Q. They range from counseling, retaining, reassignment." (Tr. p. 12)
* * *
 "Q. Before your supervisors can address your alleged problem, wouldn't it be helpful for them to have the report of your mandatory counseling session in front of them so they can review it?
 "A. I can only answer that if the counselor deems there's a problem, yes, I believe they should have the information to try to rectify the problem.
 "Q. Now, you are aware that the consent decree makes a distinction between mandatory counseling and voluntary counseling?
"A. Yes.
 "Q. And is that distinction contained in item 81, if you would review it, please?
"A. Page 34. Would you like me to answer?
"Q. Yes.
"A. It does refer to both, yes.
 "Q. Is it your understanding that if you were to attend counseling on your own of your own free will voluntarily that you would enjoy confidentiality?
"A. Yes.
"Q. So you understand that distinction?
"A. If I was to voluntarily go, yes.
 "Q. And conversely, if it is mandatory counseling, do you understand that you do not enjoy confidentiality in regards to your communications with the counselor?
 "A. Not as far as the attendance, no. The City has the right to know I attended, yes.
 "Q. So it is your understanding of the consent decree that the only piece of information that can be given through your mandatory counseling is that you attended?
"A. That's correct. That's the way I read it, yes.
"Q. Now, item 70 — are you familiar with item 70?
"A. Yes.
 "Q. And do you agree that item 70 imposes a duty upon the City to maintain records documenting mandatory counseling?
 "A. Documenting the attendance as is said in the last sentence, yes.
"Q. Why don't you read item 70 to us.
"A. The whole thing?
"Q. Please.
 "A. `The city shall maintain records documenting all mandatory counseling of officers. At a minimum, these records shall reflect the name of the officer, the reason for the referral, the general subject matter of the mandatory counseling, and whether the mandatory counseling sessions were attended.'
 "Q. Would you agree that we, the City supervisors, have a duty to keep a record of the general subject matter of the counseling session?
 "A. As described in here, the general subject matter — I'm sorry. Not the matter. Just the attendance. Not the actual hearing itself, no, but of the attendance, yes.
"Q. What do you think general subject matter means?
 "A. Well, it doesn't say that in here. Those are your words, sir.
 "Q. It says here `the general subject matter of the mandatory counseling.' What do you take that to believe?
 "A. The general subject, that would be why the complaints — what the alleged complaints were and the showing up of the attending." (Tr. pp. 13-15).
Apparent from the record throughout is the fact that Appellant is very familiar with the terms of the decree, including that which required the City to have knowledge of and keep a record of the "general subject matter" of the counseling session. Equally apparent is the fact that Appellant does not want to admit to this knowledge. For the next several questions, Appellant is evasive as to the type of release he signed and when he signed it, finally admitting that he signed a more full release of information only after his pre-termination hearing for insubordination for failing to provide said information. (Tr. p. 17). Further, Appellant claimed that his counselor, Mr. Lou Scott, gave him an option as to how much information to release to the City. Mr. Scott's letter to the City was presented at hearing at page 19:
 "Q. Okay. I'm handing you what has been marked as City Exhibit Number 3. Could you read the first paragraph on the second page of that letter. That would be the letter from Lou Scott addressed to me. Could you read that paragraph?
"A. The first paragraph, page two?
"Q. Yes.
 "A. `In addition I would also clarify that Mr. Guy voiced understanding that his referral and attendance to the EAP service was considered mandatory by his supervisor at the Steubenville Police Department. Mr. Guy was informed that in the case of mandatory counseling, communication with a supervisory designee making the referral was indicated and expected with his written authorization. With this condition understood Mr. Guy elected to authorize only for the disclosure of his attendance in the counseling session and expressly declined any further disclosure.'"
In further testimony, Appellant goes on to argue that while the Scott letter was accurate, Appellant believed he only needed to release the fact of attendance, an argument which flies in the face of the information contained in the above letter.
In fact, Scott specifically testified that he, himself explained to Appellant at the time of the counseling session that Appellant would be required to disclose certain information as to the nature of the session with the City. While obviously sensitive to the confidentiality concerns of Appellant as his patient, Scott confirmed that he advised Appellant that more information than simply a confirmation of attendance was required.
At page 87 of the transcript, Scott is being questioned by a civil service commissioner:
 "COMMISSIONER KING: What did you mean then in your June 24 communication on page 2, `In addition I would also clarify that Mr. Guy voiced understanding that his referral and attendance to the EAP service was considered mandatory by his supervision at the Steubenville Police Department. Mr. Guy was informed that in the case of mandatory counseling' — was informed by whom, by you?
"THE WITNESS: Yes.
 "COMMISSIONER KING: `Mr. Guy was informed that in the case of mandatory counseling, communication with a supervisory designee making the referral was indicated . . .' What do you mean by the word `indicated'?
 "THE WITNESS: That that was the understood procedure, that was understood.
"COMMISSIONER KING: You too understood it?
 "THE WITNESS: That if I saw someone who is referred as mandatory, then the expectation and the indication was for me to give back a recommendation — an assessment and a recommendation.
 "COMMISSIONER KING: Well, that basically was part of the terms of the referral?
"THE WITNESS: Yes.
 "COMMISSIONER KING: `And expected with his written authorization.'
"THE WITNESS: Uh-huh.
BY MS. BUKOVAN:
 "Q. I guess I'm a little confused on this sentence, too, that Mr. King brought up starting with `Mr. Guy was informed.'
 "When you talk about communication with a supervisory designee, what communication, what did you mean by the word communication?
 "A. The release of an assessment and any recommendations that I had.
 "Q. And how do you characterize your June 15, 1998 letter? You've got here assessment report.
"A. Yes.
 "Q. Is that the communication that you were referring to in your second letter to Mr. Repella?
 "A. This would constitute that type of communication, yes. But under the circumstances, if you look at the content of the letter, it only addresses Mr. Guy's attendance and what the circumstances were at that point.
 "Q. And once again if I could get some clarification, did you inform him specifically that the City expected him to disclose the specifics of his hour plus session with you?
 "A. We discussed it in terms of an expectation that I provide information back to the City that included an assessment and a recommendation, but not necessarily to disclose every detail. But in those terms, assessment and recommendation.
 "Q. On that answer one final question. When he elected to only disclose the fact that he had been there, did you indicate to him that that would probably not be sufficient?
 "A. We discussed that there would be consequences that would involve — that there would be — that it wasn't what was expected and there would be a question about it." (Tr. pp. 87-89).
Thus, from the transcript testimony it is apparent that, while Appellant claims he was unaware that he was required to release information as to the nature of his session with Scott, this claim is specifically rebutted by Scott, who testified that he told Appellant what was required and that there would be ramifications for his failure to so release this information. At this point, it becomes a credibility issue whether the commission and the trial court believed Appellant or Scott. In any event, a court of appeals does not make credibility determinations. It is axiomatic that we must leave these to the trier of fact, who, in this instance, believed Scott.
The conclusion is buttressed further by Appellant's statements to the Law Director on cross-examination. Appellant, while claiming to fully understand the consent decree, argues as earlier stated that he understood from item 70 that he only had to release attendance information on mandatory counseling. When confronted with Scott's letter, his response is then that Scott never told him, ". . . that it was mandatory that I release everything . . . I never stated that he informed me to release everything." (Tr. p. 20). This interjects an issue of "overreaching" on the part of the City. When the Law Director questions him as to just what Scott told him he had to release, Appellant becomes confused and contradictory in his answers. At this point, the Law Director asks whether Appellant ever called to ask whether Appellant could legitimately refuse to release information. Appellant responded at page 22:
"A. No. Why would I?
 "Q. That's right. Because in you mind you understood the decree?
 "A. No. By the federal law I didn't have to release everything, but we won't go into that."
In this one last sentence, Appellant admits that it was not confusion over the terms of the decree which caused him to refuse to release information, it was his belief that he had some sort of "federal law" protection from release that caused his action. Whether or not Appellant was at any point given an explanation of the decree by any City official, Appellant is a fully literate adult who read the decree.
Also, he was explained on the day of his session about the information he was to release and he still refused, without seeking any "clarification" if he so desired. What becomes clear from the transcript is that Appellant is attempting to play a game with the language of the decree in order to avoid responsibility for his own actions. The City may not have directly discussed all of the decree's terms and conditions with its employees, but it was not this failing which caused Appellant's actions and cannot be attributed to the City, as the majority seeks to do.
This conclusion is also fully buttressed in the record. At page 95 of the transcript the City Manager, Mr. Barry Du Four, testified that Appellant has been uncooperative as regards the decree in the past. Du Four, when questioned as to his interactions with Appellant, testified as follows:
 "Q. Now, that second disciplinary action, that was the first time that you had had problems with David regarding the consent decree?
 "A. Yes. This was a very different matter from the other. This involved the consent decree. And our requirement under the consent decree to assure that all parties, officers, those working for the police department signed off and gave clear statement they understood, read and understood the consent decree.
 "Q. Regarding that second disciplinary action, can you recall how many times that the City attempted to get David Guy to sign that he understood that decree?
"A. There were several —" (Tr. pp. 95-96).
* * *
 "A. There was an initial General Order that was signed off, as I recall, by all turns, indicating the availability of first meetings, separate meetings with the law director on follow up on another notice, an order specifically directed to Patrolman Guy as an individual to seek assistance of the law director if he did not understand the decree, et cetera. So there were several.
 "Q. And he eventually came in and signed an understanding, and at what time did he come in?
"A. At the time we held the disciplinary hearing.
 "Q. And I believe in this disciplinary action he did eventually come in and he signed a release of the information out at Trinity; is that correct?
"A. Yes.
"Q. And when did he sign that release?
"A. Once again, we were at the hearing level.
"Q. At the pre-termination hearing?
"A. Yes. (Tr. p. 97).
Further, Du Four testified that not only was Appellant uncooperative in coming in to sign that he read and understood the decree (and to seek explanation or clarification if necessary), when he did come in to sign, he was accompanied by his private attorney who also signed a statement to the effect that Appellant read and understood the decree. At pages 99 and 100 of the transcript, Appellant's attorney questions Du Four as follows:
 "Q. Referring your attention again to General Order 49-98, is there anything indicated on that form in addition to the order to attend the mandatory counseling that Mr. Guy was required to sign a release form and disclose all information to the City?
 "A. That is not directly referenced here except by the statement `This is a mandatory appointment.'
 "Q. So by reading that sentence, what you're saying is he should have intuitively known that that meant he was supposed to release all information?
 "A. No. You put this in perspective that — and I'm going to reflect back, if I may, to the unfortunate prior incident wherein at that time Patrolman Guy and his attorney, Bill Galloway of Weirton, as I recall, signed that he understood the consent decree. It talks about what mandatory counseling is and when the requirements therefore are. So I guess it would be presumed since he said he understood, that he would understand that language would mean."
Based on the above record, I find that Appellant's claims that he did not know what information he was required to release because he did not understand the decree to be specious. The record does not reflect that Appellant could not obtain explanation of the decree's terms if he so desired; in fact, it reflects that Appellant went out of his way to avoid such an explanation up until the time of his pre-termination hearing. Despite the mandatory nature of the language found in Item 93 of the decree requiring the City to explain all terms of the decree to all of its officers, the City cannot be expected to force feed such information to an officer who is clearly attempting to avoid it. Further, even if there is some failing on the part of the City not to pre-explain all of the decree's terms and conditions, the record is replete with evidence which, if believed, indicates that Appellant was fully explained what information he must release, understood this, and still refused to so release said information.
For all of the foregoing, I would hold that the record contains ample, competent, substantial and credible evidence which supports the determination of the trial court and would affirm the trial court and civil service commission decision in total.